# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re

DEIGHAN LAW LLC fka LAW SOLUTIONS
CHICAGO LLC d/b/a UPRIGHT LAW, LLC and          Misc. Proc. 19-301-WRS
UPRIGHT LAW; UPRIGHT LAW LLC; MARI
MORRISON; GRADY CARDEN; and
CODY FOOTE,

      Respondents.

## MEMORANDUM DECISION

This Miscellaneous Proceeding is before the Court to consider allegations levied against the

Respondents, Deighan Law LLC fka Law Solutions Chicago LLC d/b/a Upright Law, LLC and

Upright Law;[1] Upright Law; Mari Morrison; Grady Carden; and Cody Foote by the Bankruptcy

Administrator.[2]  Sabrina McKinney, the Chapter 13 Trustee, and Carly Wilkins, the Chapter 7

Trustee, join this Miscellaneous Proceedings as interested parties.  This is an exercise of this Court's

authority to supervise the practice of law in bankruptcy cases in the Middle District of Alabama.

---

[1] The lead Respondent of the Order to Show Cause is Law Solutions Chicago, LLC and is known as Upright Law, LLC.  In early 2019, Law Solutions Chicago changed its name to Deighan Law LLC.  Doc. 48 (Transcript of October 22, 2019, Hearing, pp. 26:16-27:8).  In addition, Mari Morrison, Grady Carden, and Cody Foote, three Alabama lawyers, are also named as Respondents.  The Court will refer generally to the Respondents as Upright Law or Upright, unless a more specific reference is needed.

[2] The Complaint was filed by the former Bankruptcy Administrator, Teresa Jacobs.  During the pendency of these proceedings, Teresa Jacobs retired and has been replaced by successor Bankruptcy Administrator Daniel Greco.  All future references are to Danielle Greco.

# TABLE OF CONTENTS

I. Jurisdiction..................................................................................................................3

II. Procedural History.......................................................................................................3

III. Upright's Business Model...........................................................................................5

IV. Failure of Upright Attorneys to Provide Competent Legal Counsel
and Otherwise Comply with the Alabama Rules of Professional Conduct.........................13

    A. Mari Morrison and Upright's Failure to Provide Competent
Representation to Tony Mason in Case No. 17-30132...........................................16

        1. Failure to Verify Tony Mason's Identity......................................................16

        2. Failure to Safeguard Sensitive Client Information.......................................22

        3. Failure to Obtain Mason's Signature on his Petition..................................26

        4. Transmitting Incorrect Information to Mason..............................................30

        5. Failure to Maintain a Copy of Mason's File................................................31

        6. Failure to Timely Comply with § 521(e)(2)(A)............................................33

        7. Deficiencies in Mason's Schedules..............................................................36

    B. Grady Carden and Upright's Failure to Provide Competent
Representation to James Cain in Case No. 17-32361...........................................41

        1. Deficiency of the Pre-Petition Credit Counseling Certificate.....................41

        2. Declaration re: Electronic Filing.................................................................44

        3. Issues Regarding Real Property and Conversion to Chapter 13.................46

        4. Carden's Improper Handling of the end of Mr. Cain's Case.......................47

    C. Grady Carden and Upright's Failure to Provide Competent
Representation to Clayton and Shirley Cobb in Case No. 17-32876.....................50

        1. Deficiency of the Pre-Petition Credit Counseling Certificate.....................50

-2-

        2.       Carden's Improper Handling of the end of Mr. & Mrs. Cobb's Case..........52

D.     Grady Carden and Upright's Failure to Provide Competent
Representation to Chandra Clark in Case No. 17-32873..........................................53

        1.       Deficiency of the Pre-Petition Credit Counseling Certificate....................53

        2.       Carden's Improper Handling of the end of Ms. Clark's Case.....................54

E.     Summary of Failures of Upright Attorneys to Provide Competent
Legal Services........................................................................................................57

V.    Sanctions....................................................................................................................58

VI.   Conclusion.................................................................................................................63

     Appendix..................................................................................................Appendix 1

## I. Jurisdiction

This Court has jurisdiction to hear these matters pursuant to 28 U.S.C. § 1334(b) and the District Court's General Order of Reference date April 25, 1985. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). This is a final order.

## II. Procedural History

The procedural history of this Miscellaneous Proceeding, as well as the several adversary proceedings and contested matters that gave rise to the Show Cause Order that initiated this Miscellaneous Proceeding, are involved. (Doc. 2). This Miscellaneous Proceeding came before the Court for an evidentiary hearing for seven days between October 22, 2019 and October 31, 2019. The evidentiary hearing was held pursuant to this Court's Order to Show Cause dated May 30, 2019.

(Doc. 2). This Court's May 30, 2019 Show Cause Order was preceded by a Memorandum Decision in Adv. Pro. 18-3046. *Jacobs v. Law Solutions Chicago, LLC,* Adv. Pro. 18-3046, 2018 WL 3954163 (Bankr. M.D. Ala. Aug. 13, 2018) (holding that this Court has the authority to regulate the practice of law before it). The District Court denied Upright Law leave to appeal. No. 2:18-CV-763-WKW, 2019 WL 919001, (M.D. Ala. Feb. 25, 2019).

The Bankruptcy Administrator and the Chapter 13 Trustee filed several motions and complaints in an effort to bring these issues before the Court. The complainants allege a large number of practice violations committed by Upright Law while representing debtors in this Court, resulting in sub-par representation of debtors in at least 87 bankruptcy cases in the Middle District of Alabama.[3] In the Show Cause Order, this Court has distilled the allegations into two primary issues. First, the Court questions Upright Law's business model. Upright does business throughout the United States filing consumer bankruptcy cases through local lawyers, who they call "partners." The Court questions whether the local lawyers are, in fact, partners or whether they are hired on a contract basis. The Court noted in the Show Cause Order that if they are not true partners a number of consequences may follow: the contracts for representation of debtors may be invalid; improper fee disclosures in violation of 11 U.S.C. § 329(a) and Fed. R. Bankr. P. Rule 2016(b) may have occurred; Upright may have engaged in the unauthorized practice of law; and improper fee sharing in violation of 11 U.S.C. § 504(b)(1) may have occurred. Second, the Court questions whether Upright's practice standards were below an acceptable threshold. The Court will address these two issues separately.

---

[3] The complainants have identified 87 bankruptcy cases in which they allege numerous practice violations. A complete list of the 87 bankruptcy cases is attached as Appendix B.

-4-

### III.  Upright's Business Model

In filtering through the myriad of complaints made by the Bankruptcy Administrator, the Court became concerned that Upright Law was not a true law firm, at least as that term is used in Alabama, and that non-attorneys in Chicago and non-Alabama lawyers were practicing law in bankruptcy cases filed in this district.  Before addressing the 87 bankruptcy cases, the Court will examine the structure of Upright Law and its relationship with the Alabama lawyers who it calls "partners."

Upright Law is a limited liability company organized under the laws of the State of Illinois and based in Chicago. It holds itself out as engaging in a professional business of representing debtors in consumer bankruptcy cases.  Upright employs 105 people in its Chicago office, none of whom are Alabama lawyers.  Instead, it relies on attorneys licensed in each state in which it practices to file cases, including in Alabama.

Upright Law has a sophisticated internet presence where it provides information to individuals considering a bankruptcy filing.  Prospective clients may interface with Upright personnel by telephone or chat through their website.  This interaction necessarily involves analysis and the provision of legal advice by staff, the majority of whom are not licensed attorneys and are certainly not Alabama lawyers.   The goal is for Upright staff to "onboard" the client, take their information, and populate Best Case bankruptcy forms.[4]  A retention agreement is generated and payments are made by the debtors to Upright, in both Chapter 7 and Chapter 13 cases.  The decision to file a bankruptcy case, the selection of a chapter under which to file, the preparation of bankruptcy

---

[4]  Upright Law uses the Best Case bankruptcy software, which is by far the most popular software system in use by bankruptcy lawyers in this district, and probably in the United States.

statements, schedules, plans and the like are all the practice of law in Alabama. As such, these functions should be performed by an Alabama lawyer or a properly trained and supervised staff person under the direction of an Alabama lawyer.

Upright then hires an Alabama lawyer to file the bankruptcy case and attend the Section 341 meeting of creditors. Upright contends that its Alabama lawyers are "partners" in Upright Law. These attorneys are advertised on Upright's website as partners of Upright. But, these attorneys generally have their own separate law practices. These attorneys utilize a different CM/ECF case filing password for their own practices, and a separate one for cases filed on behalf of Upright. The local attorneys sign a limited partnership agreement that provides they have no right to participate in the management of Upright and have no ownership interest or voting rights in the firm. Doc. 50 (Transcript of October 24, 2019, Hearing, pp. 56:10-57:15). Furthermore, Upright may unilaterally modify the partnership agreement and the objection to or rejection of the modification results in termination of the partnership. Doc. 50 (Transcript of October 24, 2019, Hearing, p. 57:16-25).

All three Alabama lawyers named as Respondents in this Miscellaneous Proceeding, Mari Morrison, Grady Carden, and Cody Foote, hold themselves out to be local "partners" of Upright Law and have signed limited partnership agreements with Upright. It is significant to note that the lawyers do not serve Upright exclusively. These lawyers all have established law practices which are separate from Upright Law. Moreover, all three have represented clients, under their own practice, independent of their activities with Upright Law.

Under Upright's business model and the terms of its partnership agreement, the local Alabama lawyers are labeled as partners in the Upright law firm. While Alabama law does not define what a law firm or a law practice is, FED. R. BANKR. P. Rule 9001(6) provides that "'[f]irm'

-6-

includes a partnership or professional corporation of attorneys or accountants." However, as noted above, these so-called "partners" have no right to engage in the management of the firm or control the actions of either lawyers or non-lawyer staff in the Chicago office. As such, this Court finds the local Alabama lawyers are not true partners and Upright is not an Alabama firm. The Court then considers whether the Alabama lawyers are "regular associates" of Upright. FED. R. BANKR. P. Rule 9001(10) provides that "'[r]egular associate' means any attorney regularly employed by, associated with, or counsel to an individual or firm." 11 U.S.C. § 504(b)(1) provides in relevant part that "[a] member, partner, or regular associate in a professional association, corporation, or partnership may share compensation . . . with another member, partner, or regular associate in such association, corporation, or partnership . . . ." As noted above, the Alabama lawyers maintain their separate law practices and routinely file cases apart from the cases referred by Upright. In this Court's experience, this is quite unusual for one lawyer to have two competing law practices. This aspect of the relationship alone is more consistent with notion that the three lawyers in question are hired on a contract or "piece work" basis rather than being true partners or regular associates of Upright. *See In re Ferguson*, No. 17-41615-JJR13, 2019 WL 1270451, at *4-5 (Bankr. N.D. Ala. Mar. 15, 2019) (considering "regular associate" under Rule 9001(10) as "associated with" and under § 504(b)(1) as a "regular associate in"); *see also In re Kuykendall*, 501 B.R. 311, 321 (Bankr. S.D. Tex. 2013) (holding that a local Texas lawyer was not a regular associate of a Florida law firm despite an agreement to the contrary because the Texas lawyer maintained an office separate from the Florida firm and was a partner in a firm other than the Florida firm); *In re Ferguson*, 445 B.R. 744, 752 (Bankr. N.D. Tex. 2011) (holding fee sharing between attorneys sharing office space and resources and regularly providing assistance in bankruptcy representations was improper because

attorney was not a regular associate as required by § 504(b)(1)). As such, the Court finds the Alabama lawyers are neither partners or regular associates of Upright. Furthermore, pursuant to 11 U.S.C. § 329(a) and FED. R. BANKR. P. Rule 2016(b), the attorneys were required to "file with the [C]ourt a statement of the compensation paid or agreed to be paid" and to include "whether the attorney has shared or agreed to share the compensation with any other entity." 11 U.S.C. § 329(a); FED. R. BANKR. P. Rule 2016(b). The attorneys and Upright failed to accurately comply with this requirement. Therefore, in addition to improperly sharing fees pursuant to § 504(b)(1), the attorneys and Upright violated § 329(a) and FED. R. BANKR. P. Rule 2016(b) by failing to make accurate fee disclosures.

The limited partnership agreement between the Alabama lawyers and Upright expressly contemplates that personnel in the Chicago office will be practicing law in Alabama. *See*, *Davis v. Alabama State Bar*, 676 So.2d 306 (Ala. 1996). Paragraph 2 of the partnership agreement provides, in part, as follows:

> Firm shall be the initial point of contact for all new Client calls, and shall (i) schedule and confirm retention appointment, (ii) prepare intake forms, disclaimers and agreements for Clients to sign at a retention meeting, (iii) field all Client calls and creditor/opposing counsel calls, (iv) collect/process all Client payments; including fee payments and costs to be paid out of each Client's trust account, (v) unless otherwise agreed with Partner in writing, prepare initial drafts of all legal documents to be filed with local courts in Partner's jurisdiction, subject to Partner's review, comment, revision and final approval, including bankruptcy petitions, schedules and forms, state court lawsuit pleadings and discovery documents/requests/ answers, and any and all other documents related in any way to representation of a Client in any of Firm's legal matters. Client call shall be forwarded to Partner in the event that any such Client require state-specific legal advice or Client's inquiry requires speaking directly with Partner.

Upright Exhibit 16. While many of these functions are performed by non-lawyer staff in this State, the key difference is that in this case, the "partner" is nothing more than a hired hand, working off

-8-

a piece-work basis, with no right or practical ability to supervise those doing the work.

Additionally, paragraph 4(A) of the partnership agreement provides for the allocation of fees between the firm and the Alabama lawyer. In the case of a Chapter 7 case, the Alabama lawyer is paid 8% of the fee "in the event that Partner conducts the initial consultation and retention," an additional 7% "in the event that Partner reviews the final petition in person, as required by local rules, with Client, signs the petition, and the petition is filed with Partner as attorney of record," 5% to attend the Section 341 meeting, and 5% if a discharge order is entered. (Upright Ex. 16). The contract provision is remarkable for at least three reasons. First, for completing this working and assuming this responsibility, the "partner" is paid only 20-25% of the fee, with the remaining 75-80% going to Upright.[5] Second, the contract contemplates that much of the intake, processing, and drafting will be handled by someone other than the Alabama lawyer. Third, the contract breaks down the legal services to be performed in a way that strikes one as unprofessional by setting specified monetary percentages for various tasks performed: a certain percentage to file the petition, a certain percentage to attend the 341 meeting, etc. It is similar to saying it costs so much to sew on a sleeve, so much to darn a sock, and so much to hem the pants. It raises the question, who is responsible for the whole suit?

In reality, Upright is using the Alabama lawyers to paper over the unauthorized practice of law conducted in the Chicago office. When considering cases involving the unauthorized practice of law, bankruptcy courts must look to state law for guidance. *In re Bachmann*, 113 B.R. 769, 772 (Bankr. S.D. Fla. 1990) (citations omitted). Section 34-3-6(a) of the Alabama Code provides that

---

[5] There are several different versions of the contract in evidence and there is testimony that the fee division changed slightly at some point in time, in a way more favorable to the Alabama lawyers. The Court is surprised that such a small percentage of the fee would be paid to the lawyer doing the work, with so much paid to the internet firm who gets the lead.

only individuals who "are regularly licensed have authority to practice law" in Alabama. Ala. Code. § 34-3-6(a). Section 34-3-6(b)(1) defines the practice of law as follows:

Whoever:

> (1) In a representative capacity appears as an advocate or draws papers, pleadings, or documents, or performs any act in connection with proceedings pending or prospective before a court or a body, board, committee, commission, or officer constituted by law or having authority to take evidence in or settle or determine controversies in the exercise of the judicial power of the state or any subdivision thereof; . . .

is practicing law.

Ala. Code § 34-3-6(b)(1). "The purpose of this provision of the Alabama Code is to ensure that laymen do not serve others in a representative capacity in areas that require the skill and judgment of a licensed attorney." *In re Session*, No. 18-4762-JCO, 2019 WL 1528106, at *3–4 (Bankr. S.D. Ala. Apr. 8, 2019) (citing *Andrews v. Hotel Reed Nursing Home,* 167 F.Supp.2d 1333, n. 2 (S.D. Ala. April 11, 2001)). It is a criminal misdemeanor to practice law without a license or aide another to practice law without a license in Alabama. *See* Ala. Code § 34-3-7 ("Any person, firm or corporation who is not a regularly licensed attorney who [practices] law is guilty of a misdemeanor . . . . Any . . . who conspires with, aids and abets another . . . in the commission of such misdemeanor must . . . be punished as provided by law.").

Some examples of types of services in a bankruptcy case that other courts have held constitute the unauthorized practice of law in bankruptcy court are as follows:

(1) Determining when to file bankruptcy cases.
(2) Deciding whether to file a Chapter 7 or a Chapter 13.
(3) Filling out or assisting debtors in completing forms or schedules.
(4) Solicitation of financial information and preparation of schedules.
(5) Providing clients with definitions of legal terms of art.
(6) Advising debtors which exemptions they should claim.
(7) Preparing motions and answers to motions.

-10-

(8) Advising debtors on dischargeability issues.
(9) Advising debtors concerning the automatic stay.
(10) Habitual drafting of legal instruments for hire.
(11) Correcting "errors" or omissions on bankruptcy forms.
(12) Advising clients as to various remedies and procedures available in the bankruptcy system.

*In re Samuels*, 176 B.R. 616, 622 (Bankr. M.D. Fla. 1994) (citing *In re Bright*, 171 B.R. 799, 802 (Bankr. E.D. Mich. 1994 (citations omitted)).

Upright authorized its non-attorney staff to communicate with prospective clients regarding retainer agreements prior to communicating with the Alabama lawyer regarding client retention. Doc. 49 (Transcript of October 23, 2019, Hearing, pp. 113:9-114:9). Upright also authorized its non-attorney staff to hold welcome calls with debtors, answer bankruptcy questions, and prepare for 341 meetings. Doc. 49 (Transcript of October 23, 2019, Hearing, pp. 161:16-24; 181:13-16; 121:10-122:18; 162:15-163:2; 181:24-184:6; 125:6-15; 188:23-189:1; 192:14-193:2). Within a short time after the Alabama lawyer is retained, their procedures require that he, or she, conduct what it calls a "compliance call" with the client. This is supposed to cure what would have otherwise been the unlawful practice of law in a bankruptcy filed, or to be filed in Alabama. Because the Alabama lawyers have no control over Chicago personnel, their Alabama law licenses do not somehow shelter the activities taking place in Chicago.

Attorneys practicing before this Court must abide by the Alabama Rules of Professional Conduct pursuant to Local Rule 83.1 of the United States District for the Middle District of Alabama, as adopted by Local Bankruptcy Rule 1001-2. Alabama Rule of Professional Conduct Rule 5.5 provides, in relevant part, that

(a) A lawyer shall not:

(1) practice law in a jurisdiction where doing so violates the regulation of the

-11-

legal profession in that jurisdiction; or

(2) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.

\* \* \*

(e) Practicing law other than in compliance with this rule or Rule VII or Rule VIII of the Rules Governing Admission to the Alabama State Bar, or other rule expressly permitting the practice of law, such as the Rule Governing Legal Internship by Law Students, shall constitute the unauthorized practice of law and shall subject the lawyer to all of the penalties, both civil and criminal, as provided by law.

ALA. R. PROF. C. Rule 5.5(a) & (e).

The Alabama Supreme Court, in *Davis v. Alabama State Bar*, 676 So. 2d 306, 307 (Ala. 1996), considered the discipline imposed by the Alabama State Bar Disciplinary Board for numerous violations of the Alabama Rules of Professional Conduct, which included the violation of Rule 5.5 for assisting a person to engage in the unauthorized practice of law. The Alabama State Bar presented evidence the two Alabama lawyers allowed their non-lawyer staff to provide legal services, interview clients, and prepare legal filings. *Id.* Specifically, the non-lawyer staff prepared bankruptcy petitions and gave advice to clients by explaining the differences between Chapter 7 and Chapter 13. *Id.*

The center of the dispute on this point is contained in Paragraph 10 of Upright's proposed Findings of Fact and Conclusions of Law. "As a registered professional business organization, Deighan Law is duly authorized to practice law in Alabama." (Doc. 66, Part 2, p. 4, Para 10). The Court strongly disagrees with this position taken by Upright Law. The fact that Upright law is registered as an LLC with the Alabama Secretary of State does not mean that it can practice law in this State. This Court finds the local Alabama lawyers are not partners and Upright is not an Alabama law firm. The Court further finds the Alabama lawyers are not regular associates of Upright. As such, the Upright Law personnel in Chicago, when they work on bankruptcy cases filed

-12-

or to be filed in the Middle District of Alabama, engage in the unauthorized practice of law. The fact that they hire Alabama lawyers, on a contract, piece-work basis, does nothing to paper over this reality.

## IV. Failure of Upright Attorneys to Provide Competent Legal Counsel and Otherwise Comply with the Alabama Rules of Professional Conduct

The Court now turns its attention to the conduct of Upright and the Alabama lawyers in the prosecution of the individual bankruptcy cases. The Court will not dissect each of the 87 cases identified in the Trustee's Report in this section; instead, it will examine four cases exemplifying the worst conduct of Upright and the Alabama attorneys.

During the trial, the Court stood aghast at the flippant and often cavalier attitude of Upright's witnesses when questioned about the quality of legal services provided by Upright to its clients. The most shocking example of this happened during the cross examination of Ryan Galloway, the Chief Compliance Officer for Upright:

> [OLEN] Q: All right. Then, the next sentence says, the "TT" -- I assume t hat means the Trustee. The Trustee at the 341 told her that "She is in danger of losing her home" and Upright's response to that is, "Blah, blah, blah." Did I read that correctly?
>
> [GALLOWAY] A: You read the words on the page, although you characterize it as a response. I generally read, blah, blah, blah, as kind of an ellipses.
>
> Q: Okay. Somebody at Upright talking about their debtor client who is in danger of losing her home that – that's what the Trustee said, then characterizes that as blah, blah, blah. Right?
>
> A: Yes, they did.

Doc. 49 (Transcript of October 23, 2019, Hearing, p. 194:8-20).

This exchange, and the client correspondence it discusses, epitomizes the core of Upright's existence: Providing outsourced substandard legal services to the financially distressed and vulnerable through a nationwide internet marketing campaign. As Judge Robinson of the Northern District of Alabama succinctly said, "The court does not accept as accurate Menditto's portrayal of Upright's internet cartel as an altruistic enterprise aimed at serving financially distressed consumers in remote, often overlooked venues. That portrayal flies in the face of this court's own experience and that of other courts who have confronted the marketing strategies employed by Upright, often at the expense of their clients." *In re White*, No. 16-72114-JHR, 2018 WL 1902491, at *7 (Bankr. N.D. Ala. Apr. 19, 2018), *aff'd sub nom. L. Sols. Of Chicago, LLC v. Corbett*, No. 1:18-CV-00677-AKK, 2019 WL 1125568 (N.D. Ala. Mar. 12, 2019), *aff'd* 971 F.3d 1299 (11th Cir. 2020).

Before the Court begins its discussion of the four selected cases, a review of the applicable Local Rules for this Court and the Alabama Rules of Professional Conduct is necessary.

The local rules of this Court state that "[t]he bar of this court shall consist of all members of the bar of the United States District Court for the Middle District of Alabama. Local 83.1 of the United States District Court for the Middle District of Alabama is incorporated herein by reference." M.D. Ala. L.B.R. 1001-2.

Rule 83.1 of the District Court's local rules states, clearly sets out that attorneys practicing before the court must comply with the Alabama Rules of Professional Conduct, stating in pertinent part that:

> Attorneys admitted to practice before this Court shall adhere to this Court's Local Rules, *the Alabama Rules of Professional Conduct*, the Alabama Standards for Imposing Lawyer Discipline, and, to the extent not inconsistent with the proceeding, the American Bar Association Model Rules of Professional Conduct. Attorney

misconduct, whether or not occurring in the course of an attorney/client relationship, may be disciplined by disbarment, suspension, reprimand, monetary sanctions, removal from this Court's roster of attorneys eligible for practice before this Court, or such other sanction as the Court may deem appropriate.

M.D. Ala. LR 83.1(g) (italics added).

Local Rule 83.1 then outlines the powers of the Court to remedy alleged attorney misconduct, stating that:

When alleged attorney misconduct is brought to the attention of the Court, whether by a Judge of the Court, any lawyer admitted to practice before this Court, any officer or employee of the Court, or otherwise, the Court may, in its discretion, dispose of the matter through the use of its inherent, statutory, or other powers; refer the matter to an appropriate state bar agency for investigation and disposition; refer the matter to the local grievance committee as hereinafter defined; or take any other action the Court deems appropriate. These procedures are not mutually exclusive.

M.D. Ala. LR 83.1(h).

A lawyer's duty to provide competent representation is codified in Rule 1.1 of the Alabama Rules of Professional Conduct, which states that:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. A lawyer and client may agree, pursuant to Rule 1.2(c), to limit the scope of the representation with respect to a matter. In such circumstances, competence means the knowledge, skill, thoroughness, and preparation reasonably necessary for such representation.

ALA. R. PROF. C. 1.1

The duty to safeguard sensitive client information is laid out in Rule 1.6 of the Alabama Rules of Professional Conduct, which states that "[a] lawyer shall not reveal information relating

to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b)." ALA. R. PROF. C. 1.6(a).

### A. Mari Morrison and Upight's Failure to Provide Competent Representation to Tony Mason in Case No. 17-30132

Upright and Mari Morrison's shortcomings were laid bare in the case of Tony Mason. From the docket, the testimony of Mari Morrison, and the internal communications of Upright, Mr. Mason's chapter 7 bankruptcy should have been a routine case resulting in a standard discharge. It was not.

The testimony and evidence show that Morrison and Upright were derelict in their duty of competence to Tony Mason, and the Court will address the specific failures individually in Parts 1 through 7, *infra*.

### 1. Failure to Verify Mason's Identity

Things got off to a rocky start between Upright and Mr. Mason. Mr. Mason never met with Mari Morrison, or any attorney from Upright to review and sign his bankruptcy petition. In fact, the most contact Mr. Mason had with Mari Morrison or Upright prior to the 341 was a handful of telephone calls. While distance representation is undoubtedly a sign of the modern age of legal service providers, this Court has serious concerns about the corners cut by utilizing this modern convenience.

To begin, neither Mari Morrison nor Upright took reasonable steps to ensure Mr. Mason's identity before accepting him as a client and filing a chapter 7 petition. Mr. Mason provided Upright

staff in Chicago with basic personal information such as his name, address, and social security number. However, while Mr. Mason provided the information, Mari Morrison never actually met with Mr. Mason to review his driver's license and social security card and verify his identity prior to the 341, nor did she engage with Mr. Mason via video conferencing to visually inspect his driver's license and social security card to confirm his identity.

The testimony of Ryan Galloway, Upright's corporate witness, was quite informative about the intake process for Upright prospective clients and its evolution since Upright's inception. On direct examination, Galloway revealed that:

> [GALLOWAY] A: [ . . . ] In September of 2015, the firm changed in a fairly substantial way, the manner in which it was delivering legal services; like, the internal processes that were engaged by the firm up until September 9, 2015 are different than those engaged by the firm after that date.

Doc. 48 (Transcript of October 22, 2019, Hearing, pp. 109:21-110:1).

Galloway further explained the shift in Upright's practices post-September 2015.

> [GALLOWAY] A: So under the first model, or under the old model, we had attorneys that were in the Chicago office who were the first drafters of the petition schedules and the statements. And we also had a document collection department in the home office in Chicago and we also had document storage -- database, we had a database where we -- where -- where we stored all the documents we were collecting.
>
> After September of 2015, the biggest change was that the partners started doing their document collection and drafting of the first -- doing the first draft of the petition themselves.
>
> [ARMGARDT] Q: And when you say, document collection, are you talking about documents from the client?
>
> A: Yes.

-17-

Q:  Such as?

A:  Taxes, stubs --

Q:  Pay stubs, you mean?

A:  -- yeah, I'm sorry.  Pay advices, IDs, driver's licenses, social security cards, bank statements -- it really all depends on where the -- the documents can vary a lot depending upon where the client is and the factual circumstances of their own life.

     But generally, the -- the documents that are kind of common to everyone are ID, social security card, bank statements and two years of tax returns -- at least two years of tax returns, sometimes more.

Doc. 48 (Transcript of October 22, 2019, Hearing, pp. 110:11-111:11).

     While discussing the prior practice of document collection at Upright's Chicago office, Galloway testified that:

THE WITNESS [GALLOWAY]:  [ . . . W]e used to require our clients, based on some practices that are now defunct, to submit at the outset of the representation a copy of their picture ID and social security card and the reason for that is because one of our big advertising points to people, at least it used to be, is that they had the option of meeting over Skype -- with people rather than having to go in during regular business hours, take a day off work, things of that nature which meant that in order to verify identification, we would get -- we would get from the outside representation, get a copy of their picture ID and their social security card.

     And then, we would actually Skype the clients to build and do the review appointments with the clients, we would actually capture a picture of the person holding up their ID next to their face.  And then, we would be able to compare the documents that were originally provided to the ones we were later on, so that we would know that we had met our obligations in verifying the identity of our clients.  And then, we'd save that separately.

Doc. 48 (Transcript of October 22, 2019, Hearing, pp. 72:17-73:11).

-18-

Mason's petition was filed by Mari Morrison on January 18, 2017. The testimony and evidence indicate that by the time Mason filed his petition, the intake personnel in Chicago were no longer collecting documents and verifying the identity of a prospective client. That responsibility fell on Mari Morrison's shoulders, and Morrison's own testimony confirms that she was derelict in her duty to verify Tony Mason's identity:

> [OLEN] Q: He, the client, mentioned that he had not met with you in person or through video conference in order to sign his petition. Did I read that correctly?
>
> [MORRISON] A. That is correct what you read.
>
> Q: And then goes on to say -- Mr. Weinacker says some trustees may ask the client whether they signed the petition in the presence of an attorney. Do you see that?
>
> A: Yes.
>
> Q: So clearly, if Tony Mason is to be believed, you didn't meet with him in person and you didn't meet with him over Skype when he signed these bankruptcy papers, correct?
>
> A: That would more than likely be correct.
>
> Q: That's not how it's supposed to be done, is it?
>
> A: Every effort is made and sometimes you can't make those connections.
>
> Q: But that wasn't the question. I said that's not how it's supposed to be done, is it?
>
> A: No. Not ideally.
>
> Q: It's not just not ideal, it's just not acceptable, is it? Is it?

A:  It's acceptable:

THE COURT:  Wait a minute.  Wait a minute.  Wait a minute.  Wait a minute.  You mean a petition in bankruptcy, the schedules are being filed and you haven't even talked to the client?  Is that what you're saying is acceptable?

THE WITNESS:  That's not what I'm saying I'm --

THE COURT:  Okay.  Let's --

THE WITNESS:  He just said you haven't met with him.  I've talked with him numerous times by telephone.

THE COURT:  All right.  You talked to him by phone.

THE WITNESS:  And we had many communications.  E-mail, telephone, numerous communications.

THE COURT:  All right.  Sorry I misunderstood.  Well, if you're not meeting with a client face-to-face such as in this case, the Tony Mason case, how do you satisfy yourself that the schedules and statements and things that are filed with the client's signature are in fact -- the client has done something to show that he intends to sign them?

THE WITNESS:  Well, as I said before, these are sent to the client in an email.  And once the client gets the email, what I would attempt to do would be to set up a Skype interview to see the client in front of me and to do the review of the petition and the documents and make any changes necessary.

There are times that I have set up the interviews and then call the client and the client can't -- either can't do the Skype or it's not working or something's messing up.  I've even had times where people could see me but I couldn't see them or they could see me -- whatever -- the other way around.  But – and I cannot recall with this instance if that's what happened but I do trust the fact that perhaps we did not meet until the 341 meeting but had numerous

-20-

communications prior to that date.

Doc. 51 (Transcript of October 28, 2019, Hearing, pp. 132:7-134:9).

The cavalier, or at best flippant, attitude exhibited by Morrison in the face of her failure to verify Mason's identity prior to commencing the bankruptcy case astounds the Court. The Court finds that she placed far too much faith and reliance in the Upright staff in Chicago as well as telephonic and email correspondence. Morrison knew, or should have known, that the intake personnel in Chicago had not verified Mason's identity prior to referring Mason to her given that Upright's new internal policy was more than a year old.

Further, despite her belief, sending an email to an email address does not carry the same weight of authenticity as mailing a document through the United States Postal Service to a person's mailing address. The presumed validity of receipt for documents sent through the mail to a physical address stems from the fact that the recipient's address was established through some affirmative act taken by the recipient with the Post Office to ensure that his or her mail is delivered to the correct address.

Email is a horse of a different color as it generally requires no form of identity verification. For example, Yahoo! could potentially allow someone to create the email address "johnqdebtor@yahoo.com" without verifying that the person requesting that email address is in fact someone named John Q. Debtor.

While form B121 requires the Debtor in an individual bankruptcy case to verify their full Social Security number by affixing their signature from the form, it also provides Debtor's counsel another opportunity to make sure the numbers match. People make mistakes, especially when faced with 60 or 70 pages of legalese paperwork, and sometimes numbers get transposed, duplicated,

omitted, or simply incorrectly entered. That is why Morrison, as bankruptcy counsel, had a duty to independently verify that the social security number indicated on form B121 matched the social security number on debtor's social security card or another official document. Since Morrison never met with Mason in person or by video, she was never able to visually verify the number against Mason's Social Security card.

For her failure to confirm Mason's identity, Morrison deserves the lion's share of blame. Once she received the referral from Chicago, she had a duty to verify the identity of her prospective client and his social security number before filing a petition in bankruptcy. Mari Morrison failed to exercise her duty.

Ultimately, both Morrison and Upright had a duty to verify that Tony Mason was in fact Tony Mason prior to filing a bankruptcy case on his behalf. Prior to Mason's attendance at the first setting of his 341, neither Morrison nor Upright met with Mason either in person or via video conference to inspect his photo ID. While the trustee ultimately inspected his photo ID at the 341 and verified his identity at that point, the fact remains that until that point, Morrison and/or Upright were preparing and filing legal documents on Mason's behalf despite the fact that neither had laid eyes on him.

## 2. Failure to Safeguard Sensitive Client Information

To compound an already bad situation, Morrison filed unredacted paystubs in Mason's case that displayed the full Social Security number indicated in Mason's schedules on all six pages. According to Morrison, the failure to redact was the result of an error in the software she utilized. While that very well might be the case, Morrison again had a duty to protect both his Social Security

-22-

number and bank account number from public exposure, especially given the fact that she failed to verify that it was in fact Mr. Mason's social security number before she filed the document.

Certainly, the commencement of a bankruptcy petition requires the disclosure of the debtor's full social security number to the clerk of court in order to generate the Notice of Bankruptcy forms transmitted to the debtor's creditors. *See* Form B121 – Statement Regarding Your Social Security Number. Additionally, any and all bank accounts owned by the debtor must be disclosed on Schedule A/B. However, only the last four digits of a debtor's social security number are displayed on the public docket, and only the last four digits of the bank accounts are required in Schedule A/B.

The Federal Rules of Bankruptcy Procedure restrict the filing of documents containing sensitive information:

> (a) REDACTED FILINGS. Unless the court orders otherwise, in an electronic or paper filing made with the court that contains an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual, other than the debtor, known to be and identified as a minor, or a financial-account number, a party or nonparty making the filing may only include:
>
> > (1) the last four digits of the social security number and taxpayer-identification number;
> >
> > (2) the year of the individual's birth;
> >
> > (3) the minor's initials; and
> >
> > (4) the last four digits of the financial-account number.

FED. R. BANKR. P. 9037(a)

The local rules of this Court further specify that "[t]he responsibility for redacting the personal identifiers discussed in Rule 9037, Federal Rules of Bankruptcy Procedure, rests with counsel and the parties. *The clerk is not required to review pleadings for compliance with this rule*." M.D. Ala. L.B.R. 9037-1(a) (emphasis added). The local rules require that:

-23-

(a) When a party discovers or is notified that a document containing personal identifiers was filed, the party *must* do the following:

(1) file a motion to redact identifying the proposed redactions;

(2) attach to the motion the proposed redacted document;

(3) include in the motion the docket or proof of claim number of the previously-filed document; and

(4) serve the motion and attachment on the debtor, debtor's attorney, trustee (if any), Bankruptcy Administrator, filer of the unredacted document, and any individual whose personal identifying information is to be redacted.

M.D. Ala. L.B.R. 9037-1(b) (emphasis added).

Incorrect or false Social Security numbers present a uniquely serious problem within the bounds of bankruptcy law. The Court's docketing system, CM/ECF, gathers certain data from PACER, which utilizes a debtor's Social Security number to determine prior filings and to generate the Notice of Prior Filing that appears on a debtor's docket sheet. While this problem is ultimately a correctable mistake, if it is not detected and remedied, an erroneously listed prior case could seriously endanger a debtor's discharge in the new case or subject the new case to dismissal on the grounds of abusing the system through repeat filings.

Further, every bankruptcy case is linked to the social security number listed in the petition. As such, the credit score associated with that social security number is negatively affected by the filing of that bankruptcy. False or incorrect social security numbers on the petition can destroy the good credit of a third party actually assigned the listed social security number. Clearly, neither Morrison nor anyone at Upright was particularly concerned about commencing new bankruptcy cases under unverified social security numbers.

Both Morrison and Upright had a duty to safeguard Mason's confidential information under the Alabama Rules of Professional Conduct, the Federal Rules of Bankruptcy Procedure, and the

-24-

local rules of this Court, for which they grossly failed to fulfill their duty. The Court acknowledges that technology is sometimes imperfect; Morrison claims that she labored under the belief that she had redacted the information on her computer. She very well may have; however, her duty to redact the social security number did not cease once she purportedly redacted the information on her computer. Rather, she had a duty to verify that the sensitive and confidential information contained in those paystubs was indeed sanitized before she filed the document with the court. That is where her failure began, but it was not the end.

Unfortunately, her failure remained in place for more than three years while the paystubs languished on Mason's docket sheet. In those three years, Morrison failed to file a Motion to Redact in the case as required under Rule 9037 and local rule 9037-1, leaving Mason's full social security number sitting on a public docket. On February 25, 2020, this Court *sua sponte* restricted access to the paystubs containing Mason's full social security number.

The fact that the unredacted document remained on the docket sheet more than three years speaks volumes about the incredible lack of concern for client confidential information exhibited by both Morrison and Upright. This Court finds that their actions and inactions clearly constitute violations of Rule 1.6 of the Alabama Rules of Professional Conduct, Rule 9037 of the Federal Rules of Bankruptcy Procedure, and Rule 9037-1(b) of the Local Rules of the United States Bankruptcy Court for the Middle District of Alabama.[6]

---

[6] The issue of unredacted Social Security Account Numbers was pervasive in the 87 Upright cases. Aside from the Tony Mason case, there were unredacted Social Security Account Numbers in the following cases: Shaun & Christina Lewis, 14-80964; Robert & Phyllis Wilson, 16-33607; Michael Miller, 16-80140; Zachary & Kaitland Causland, 16-81072; Benjamin Kinsman, 16-81102; Caroline Stevens, 16-81413; Ian Willett, 16-81572; Mary McKinnes, 17-11726; Rickey Jackson, 17-32767; Christopher Culverhouse, 17-80243; Sydelle Story, 17-80547; Derrick Echols, 17-81163; William Liver & Lisa Miller, 18-32711.

### 3. Failure to Obtain Mason's Signature on his Petition

Beyond Morrison's failure to confirm Mason's identity prior to the commencement of Mason's case, she also failed to obtain Mason's signature on his petition prior to filing. While certain exigencies can exist from time to time, especially in the context of an emergency petition for relief, none of those exigencies were present in Mason's case, and in no event is it acceptable for a month or more to elapse from the petition date with the schedules still unsigned.

Mason's bankruptcy case was filed on January 18, 2017 and the original date for the meeting of creditors was February 17, 2017 at 9:00 AM. On February 14, 2017, almost a month after his petition was filed, Mason informed Upright in Chicago that he had neither met Morrison in person, nor had Mason video conferenced with her in order to sign his petition or affirmatively endorse his petition and schedules. (Ex. 1083). The only communication between Mason and Morrison was a series of telephone conversations and email exchanges.

> [OLEN] Q: Here is an entry on February 14, 2017 by Grafton Weinacker. You see that?
>
> [MORRISON] A: Yes.
>
> Q: I just spoke with this client, and talks about in regard to the 341 meeting. Do you see that?
>
> A: Yes.
>
> Q: He, the client, mentioned that he had not met with you in person or through video conference in order to sign his petition. Did I read that correctly?
>
> A. That is correct what you read.
>
> [ . . . ]

Q: So clearly, if Tony Mason is to be believed, you didn't meet with him in person and you didn't meet with him over Skype when he signed these bankruptcy papers, correct?

A: That would more than likely be correct.

Doc. 51 (Transcript of October 28, 2019, Hearing, p. 132:1-18).

Despite that exchange, Morrison later offered the following testimony regarding her practice of gathering wet ink signatures for bankruptcy petitions:

THE COURT: [ . . . ] How do you know and we know that lawyer's responsible for making sure that the client somehow has done something to signify, yes, this is -- I want these signed, these are mine.
So my question is, how do you know that the client has signed off on these particular schedules?

THE WITNESS [Morrison]: Before I would file any petition, I always required that I had the wet ink signature pages in my possession.

THE COURT: So the wet ink signature pages of the petition, the schedules, so you have all those somewhere?

THE WITNESS: Yes.

THE COURT: Oh. All right.

THE WITNESS: And I believe there was testimony from Mr. Galloway that they're audited by Upright.

Doc. 51 (Transcript of October 28, 2019, Hearing, p. 136:2-12).

Morrison's testimony is clearly inconsistent. Despite her steadfast assurance that she "always" obtains wet ink signatures prior to filing bankruptcy petitions, the evidence and her own testimony indicate that Mason did not execute a wet ink signature on any of his bankruptcy

-27-

documents prior to the commencement of his case, and in fact did not do so until the first setting of the 341.

Moreover, while Upright instituted its "Signature Page Audit Program" in order to ensure that the local attorneys obtained "wet ink" signatures on petitions, schedules, statements, and amendments to statements, it did not roll out this program until May of 2017 – almost four months after Mason's petition was filed. (Ex. 20).

Bankruptcy Rule 5005 envisages that almost all documents filed in bankruptcy cases through counsel are electronic documents and that "[a] filing made through a person's electronic-filing account and authorized by that person, together with that person's name on a signature block, constitutes the person's signature." Fed. R. Bankr. P. 5005(a)(2)(C).

Additionally, Bankruptcy Rule 1008 and 28 U.S.C. § 1746 do not expressly prohibit the use of electronic "/s/" signatures in bankruptcy filings. Rule 1008 requires that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided by 28 U.S.C. § 1746." Fed. R. Bankr. P. 1008. Section 1746 requires that:

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

-28-

(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

28 U.S.C. § 1746.

To clarify, the Court is not insinuating that the only way for a debtor to sign or execute the petition, schedules, and statements is by a wet ink signature, or that attorneys should not file documents lacking wet ink signatures. The Upright Respondents urge this Court to accept their use of electronic signatures in lieu of wet ink signatures. In support of this plea, Upright Petitioners cite to 15 U.S.C. § 7001, the Electronic Records and Signatures in Commerce Act. *See* Doc. 66 at 26-27. The Upright Respondents have put their cart in front of their horse.

Electronic filings and "/s/" signatures are an immovable fixture in the modern practice of law, and as such, the Court does not take issue with the debtor or counsel affixing a "/s/" signature in lieu of a traditional pen-to-paper delivery of the signature. The Court does take issue with counsel affixing a debtor's "/s/" signature under inappropriate or impermissible scenarios. An attorney should not affix a client's "/s/" signature to a document unless the client has reviewed and affirmatively authorized, executed, or signed the document itself.

Before filing a document with a client's "/s/" signature, the attorney should have no doubt that such authorization, execution, or actual signature took place. As discussed in Part 1, *supra*, neither Morrison nor Upright verified Mason's identity prior to the first setting of the 341, and the

evidence and testimony indicate that Mason had not signed the documents prior to that same date. Therefore, the Court finds it painfully clear that Morrison and Upright affixed Mason's "/s/" signature to his petition, schedules, and statements despite a lack of verified identity and certainty that he reviewed, executed, or signed the documents. That is their failure, and a violation of Morrison and Upright's duty of thoroughness under Rule 1.1.

### 4. Transmitting Incorrect Information to Mason

Perhaps the most astounding testament to Morrison's failure in Mr. Mason's case was the way she mishandled its implosion. As previously stated, nothing appearing on the docket for Mr. Mason's case indicated that his chapter 7 would be anything other than a routine "no asset" case. There were no adversary proceedings filed by or against Mason, there were no reaffirmation agreements filed, and, as previously referenced, there were no assets for the trustee to liquidate.

On May 19, 2017, Mr. Mason's case was closed without a discharge because he failed to complete a financial management course. (Exhibit. 421). Despite this, Morrison informed Mason that he received a discharge. (Exhibit. 39). This was clearly and obviously wrong and can only be explained by a lack of thoroughness on Morrison's part.

Morrison testified that she reached out to Mason on several occasions, to discuss the status of his case after it was closed without a discharge.

> [ARMGARDT] Q: Now after the case was dismissed do you think you should have taken some further action?
>
> [MORRISON] A: I notified repeatedly the address that had for this gentleman, and continued to try reaching out to him.
>
> Q: In order to discuss next steps?

A:  Yes.

Q:  If any?

A:  Yes.

Q:  And what happened then?

A:  Well, I didn't hear from him until, I want to say last spring.  He called me at 1:30 in the morning.

Q:  He had your --

A:  Well, he always had my cell phone.  Yeah.

Q:  And he -- so what happened during that phone call?

A:  He told me that he was ready to get back started on getting his discharge.  Well, by that time it was already, you know, over a year.  And I told him, I said -- I told him that it would have to start all over again because it had been dismissed.

Q:  I see.  And what happened next?

A:  Well, I haven't heard from him.

Doc. 51 (Transcript of October 28, 2019, Hearing, pp. 39:22-40:17).

After Mason's case was reopened in response to the Trustee's motion, Mason filed a Financial Management Course Certificate on May 3, 2019.  Mason received his discharge under 11 U.S.C. § 727 on May 9, 2019.

### 5.  Failure to Maintain a Copy of Mason's Case File

Compounding the signature genuineness issues discussed in part 3, *supra*, is Mari Morrison's failure to maintain and preserve Mason's client file.  As discussed in Part 2, *supra*, Mari Morrison,

as an attorney admitted to practice before this Court, is bound by the Alabama Rules of Professional Conduct.

The Alabama State Bar has adopted the "entire file" approach to determine what constitutes the client's file.  According to Ethics Opinion 2010-02:

> [t]he "entire file" approach provides that the client owns and is, therefore, entitled to all of the documents within the client's file, unless the lawyer establishes that withholding items would not result in foreseeable prejudice to the client or would, as previously discussed, endanger the health, safety or welfare of the client or others.

State Bar of Ala. Office of the Gen. Counsel, Ethics Op. 02 at 7 (2010) (citations omitted).

The schedules and petition containing the original wet ink signatures are clearly part of Mason's "entire file" under the Alabama Rules of Professional Conduct.  As such, Rule 1.15 governs the length of time she must maintain and preserve that file for the client.  Ethics Opinion 2010-02 clearly states that:

> [g]enerally, a lawyer should maintain a copy of the client's file for a minimum of six (6) years from the termination of the representation or conclusion of the matter.  A lawyer's failure to maintain a file for this minimum period of time is presumptively unreasonable based upon consideration of the statute of limitations under the Alabama Legal Services Liability Act (Ala. Code § 6-6-574) and the six-year period of limitations for the filing of formal charges in lawyer disciplinary matters (Rule 31, Alabama Rules of Disciplinary Procedure). Six (6) years is the absolute minimum period, but special circumstances may exist that require a longer, even indefinite, period of retention.

State Bar of Ala. Office of the Gen. Counsel, Ethics Op. 02 at 6-7 (2010).

Morrison's testimony demonstrates her complete lack of understanding of Rule 1.15 and her duties thereunder:

[OLEN] Q: My question is you just told the Court you have signed original wet ink signatures and I want to know if you have them in your possession right now today?

[MORRISON] A: No.

Q: What happened to them?

A: Well when the year passed and the time expired I did some cleaning because you can do a lot and I've moved.

Q: Well what time did it start?

A: And I left Upright in 2017.

Q: What time expired that caused you to throw away these original signatures?

A: I think somewhere I had read something that says that you're supposed to keep them for a year.

Doc. 51 (Transcript of October 28, 2019, Hearing, pp. 137:19-138:6).

Again, Morrison's actions demonstrate her ignorance of the Alabama Rules of Professional Conduct.

### 6. Failure to Timely Comply with § 521(e)(2)(A)

During the course of his bankruptcy, Mason's 341 was continued twice due to filing deficiencies. The most glaring of the deficiencies was the Debtor's failure to provide the Chapter 7 Trustee with a copy of his federal tax return in compliance with 11 U.S.C. § 521(e)(2)(A). The provisions of § 521 require that

The debtor shall provide—
(i)    Not later than 7 days before the date first set for the first meeting of creditors, to the trustee a copy of the Federal income tax

-33-

return required under applicable law (or at the election of the debtor, a transcript of such return) for the most recent tax year ending immediately before the commencement of the case and for which a Federal income tax return was filed; and

(ii)　　at the same time the debtor complies with clause (i), a copy of such return (or if elected under clause (i), such transcript) to any creditor that timely requests such copy.

11 U.S.C. § 521(e)(2)(A).

The consequences are stark for a debtor's failure to timely provide the trustee with a copy of the most recent federal tax return. Section 521(e)(2)(B) states that "[i]f the debtor fails to comply with clause (i) or (ii) of subparagraph (A), the court shall dismiss the case unless the debtor demonstrates that the failure to so comply is due to circumstances beyond the control of the debtor."

11 U.S.C. § 521(e)(2)(B).

Morrison's testimony established that she was aware that Mason had not filed his federal tax return:

> [ARMGARDT] Q: Do you feel you were diligent and competent in this case?
>
> [MORRISON] A: Yes. I did -- I worked very hard for this gentleman. In fact, we had a difficulty of getting his -- everything together. Mr. Mason had not filed his taxes in two years and that delayed getting information into the court. I knew where he worked. I had his paycheck, W-2 forms, copies of them. And ultimately, I offered to him when I was talking to him about how we had to get this in.
>
> I asked him if he wanted me to prepare for him his 1040X or short form taxes based upon the information on his W-2 forms. And I said now I'll just be preparing this for you. It's not as a professional accountant, nor is it in my capacity as -- with Upright Law. This was just something that will help you get your taxes paid and you'll probably get a refund back. Because he wasn't a high income. So I did prepare and send to him two years of tax forms that apparently he did file and he sent me copies of the signed ones that I ultimately

-34-

filed with the court -- or the Trustee.

Doc 51 (Transcript of October 28, 2019, Hearing, pp. 41:23-42:16)

Mason's petition was filed on January 18, 2017, and the next day, the clerk's office set Mason's initial 341 for Friday, February 17, 2017 at 9:00 AM. Under § 521(e)(2)(A), Mason's tax returns were due to the trustee no later than Friday, February 10, 2017.

The statutory language is clear. Tax returns are due to the trustee seven days prior to the first setting of the 341, and a failure to do so subjects the debtor's case to dismissal. While the burden to produce the returns ultimately falls on the debtor's shoulders, Morrison must bear some of the blame because she took it upon herself to prepare a Form 1040 return for Mason.[7]

As discussed in part 7, *infra*, Mason had been paying Upright for nearly a year in anticipation of filing a chapter 7 bankruptcy. When Morrison received the file from the Upright staff in Chicago, or immediately thereafter, she knew, or should have known, that Mason had unfiled tax returns. Based on her testimony, she had all the necessary documents to prepare Mason's tax return, which she ultimately did, but at considerable delay. The two continuances of his 341 relating to tax return and Schedule A/B issues show that the trustee did not receive Mason's returns by the § 521(e)(2)(A) deadline.

In addition to the requirements under the Bankruptcy Code, Rule 3.2 of the Alabama Rules of Professional Conduct states that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." The official comment to Rule 3.2 further cautions that "[i]t is not a justification that similar conduct is often tolerated by the bench and bar." ALA. R.

---

[7] The Court notes that while Morrison testified that she prepared Mason's "1040X or short form taxes," 1040X is used only for *amended* individual returns. *See* Trial Tr. 42, *In re Deighan Law LLC*, No. 19-301 (Bankr. M.D. Ala. Oct. 28, 2019), ECF No. 51.

PROF. C. 3.2, Comment (June 23, 2008). The Court is not suggesting that Morrison delayed her preparation of Mason's tax returns so that Mason would gain some untoward advantage over the trustee or his creditors. However, Morrison was bound by her duty of competence and her duty to reasonably expedite Mason's bankruptcy, and she was derelict in both of those duties.

Additionally, the Court is not insinuating that it is misconduct for an attorney to file a bankruptcy petition for a debtor who has outstanding tax returns; in fact, the Bankruptcy Code contemplates this exact scenario by the language of § 521(e)(2)(A)(i). With that in mind, the Court does require that an attorney who prepares a debtor's tax returns to act with all reasonable expedience in order to not endanger debtor's bankruptcy case.

The fact that Mason ultimately received a discharge is irrelevant when reviewing the conduct of Upright and Morrison's actions in the case for misconduct. Morrison's failure to prepare Mason's tax returns and transmit them to the trustee by February 10, 2017 left Mason vulnerable to dismissal. Given the substantial time that elapsed between Mason's initial communication with Upright and when Morrison filed Mason's petition, there is no excuse for the delay in getting Mason's tax returns to the trustee.

### 7. Deficiencies in Mason's Schedules

Finally, Mason's case wallowed unceremoniously for months waiting on Morrison to correct obvious errors in Mason's schedules. At the initial setting of Mason's 341, trustee instructed Mason and Morrison to amend Schedule A/B to include an unlisted vehicle and unlisted bank accounts. The court will examine the deficiencies along with other mistakes, focusing on the reasonableness of each omission and/or error.

First, Mason's initial schedules listed only $100 in clothing on Schedule A/B; there were no vehicles, cell phones, bank accounts, tools, jewelry, etc. Mason listed only the clothes on his back. Despite the absence of bank accounts on Schedule A/B, the paystubs filed by Morrison on Mason's behalf clearly indicated that all of Mason's paychecks in the 60 days preceding the filing of his chapter 7 were deposited directly into a checking account.

The bank account information on Mason's paystubs should have prompted Morrison to assist Mason in disclosing the account in his schedules in one of two applicable locations. First, if Mason still maintained the bank account indicated on his paystubs, then he had a duty to list the account as an asset on line 17 of Schedule A/B under "Deposits of Money." Conversely, if Mason had closed the account prior to the filing of his petition, then he had a duty to disclose the closure of the account in Part 8, Question 20, of the Statement of Financial Affairs. In the initial filing, neither Schedule A/B nor the Statement of Financial Affairs listed any open or closed bank accounts.

As discussed in Part 2, *supra*, Morrison drafted Mason's schedules based on information provided by Mason to Upright. It is evident that Morrison reviewed the paystubs in order to input Mason's income and employment information on Schedule I and Form 122A. The bank account information was not particularly hidden on Mason's paystubs; it was clearly identified in the "net pay" section of the paystubs, with "Account Type" selected as "Checking."[8] An attorney exercising a reasonable amount of care would have caught that omission and discussed the matter with their client prior to filing the entire petition.

Whether this omission was intentional or accidental on Mason's part, Morrison had a duty

---

[8] The Court does not cite to the paystubs in question on Mason's docket sheet in Case No. 17-30132 because they are now restricted from public access due to the presence of Mason's social security number, as discussed in part 2, *supra*.

to review Mason's schedules, paystubs, statements, and declarations, to ensure that Mason had followed the instructions printed on the documents. This is not to say that Morrison had a duty to act as the sole point of quality control. Indeed, Mason certainly knew more about the state of his property than Morrison. However, Morrison failed to recognize and reconcile the obvious information on Mason's paystubs with the information Mason provided on his sworn schedules and statements.

The omission of debtor's 2005 Nissan Altima from line 3 on Schedule A/B is equally as troubling, particularly because the Nissan was financed. This omission was another reason why Mason's 341 was twice continued by the trustee; ultimately, this was not added until three months post-petition, and one day before the final setting of the 341. When questioned about the delay, Morrison offered the following explanation:

> [ARMGARDT] Q: The final bullet point in the discussion of this case in petitioner's report makes reference to, quote, inaccuracy of schedules.
>
> [MORRISON:] A: Yes.
>
> Q: Do you see that?
>
> A: Yes.
>
> Q: And what do you understand is that issue?
>
> A: It had to do with the car. When I got the information from the client he had told me that he had wrecked a car and he still owed on the car so that was an issue as far as being able -- I mean, the car was not derivable [sic] but he still owed on it and he was facing, I believe, garnishment. So it was important to him to get the discharge because of the inoperable car and the debt that he was facing. I think he had told me that he was using someone else's car, something to that nature. And when we did get to the 341 Meeting he said that he had

-38-

bought another car, Buick. And that's the first I have heard of it. But it turns out it was at best a strange buy. He couldn't tell me who he bought it from. It was like Uncle Joe or something like that. And I think he paid maybe $200 on it and he owed maybe $500 more. Something of that nature. And as I tried to amend the schedule I never could get a real name and address from him as to who the creditor was.

Q: Well, did you do anything to address the situation in your court filings?

A: I tried to file amended filings that would at least disclose that I was attempting to remedy that secured debt that I doubt if anything had actually been filed to secure it. But because it was like a local buy it wasn't a dealership or anything of that nature.

Doc. 51 (Transcript of October 28, 2019, Hearing, pp. 40:18-41:22).

The Court does not question Morrison's efforts to locate the purported secured creditor. The Court takes issue with Morrison using this as a justification for her delay in filing an amendment to Schedule A/B. The Court also notes that the amended Schedule A/B filed on April 20, 2017, lists a 2005 Nissan Altima valued at $2,063, and the amended Schedule D shows that Mason owed Melvin Sudduth $2,000 against the Altima. Morrison's own testimony indicates that the fly in the ointment preventing her from amending all of Mason's schedules was the fact that she did not have an accurate name or address for the secured creditor. However, Schedule A/B does not require the debtor to list a secured creditor; in fact, there is not a line for a secured creditor.

Further, unlike Schedules D and E/F, this Court does not charge a fee to amend the remainder of the debtor's schedules. Thus, Morrison could have filed Mason's amendments to Schedules A/B and C to add the vehicle and bank accounts without incurring a $31 filing fee. The Court does not understand Morrison's apparent aversion to addressing filing deficiencies on an

individual basis. There was no need to delay the amendment to Schedules A/B and C while Morrison and Mason attempted to gain information sufficient to amend Schedule D.

Beyond the omissions on Schedules A/B and the failure to timely amend, Morrison also erroneously included several items in Mason's schedules and statements. First, Mason's social security benefits are included on line 2 of Form 122A-1 as "gross wages, salary, tips, overtime, and commission" despite the exclusion of social security income from the Means Test Calculation.[9] To make matters worse, Line 10 of the Statement of Financial Affairs stated that Colonial Auto Finance repossessed Mason's 2001 Buick Regal in the summer of 2016, yet five pages later, Form 108 stated that Mason intended to retain the 2001 Buick Regal and reaffirm the debt with Colonial. Again, this underscores Morrison's lack of competency and thoroughness with regard to the information placed in Mason's schedules.

While Mason ultimately received a discharge of his debts, Morrison's decision to delay the amendments to Schedule A/B to list the bank accounts and newly purchased vehicle delayed and endangered Mason's ability to seek a discharge. Additionally, Morrison's skill and thoroughness in the initial drafting of, and amendments to, Mason's schedules fell below the minimum standard prescribed in Rule 1.1.

---

[9] While Mason did not file a supplement to Form 122A-1 breaking down his income, the total of line 2 is $1,966.99. Line 12 on Schedule I is also $1,966.99, which includes $1,001 per month on line 8e "Social Security" income. As these numbers are identical, the Court concludes that the $1,966.99 on line 2 of Form 122A-1 includes $1,001 of social security income.

## B. Grady Carden and Upright's Failure to Provide Competent Representation to James Cain in Case No. 17-32361

The Court next directs its attention to the case of James Cain, case no. 17-32361, in which the debtor, Mr. Cain, was represented by Grady E. Carden. Unlike the Tony Mason case, the failures of Carden and Upright came at the expense of Mr. Cain's discharge.

### 1. Deficiency of the Pre-Petition Credit Counseling Certificate

One of the most fundamental hurdles for a prospective consumer debtor in bankruptcy to clear is the requirement of § 109(h)(1), which states that:

> Subject to paragraphs (2) and (3), and notwithstanding any other provision of this section other than paragraph (4) of this subsection, an individual may not be a debtor under this title unless such individual has, during the 180-day period ending on the date of filing of the petition by such individual, received from an approved nonprofit budget and credit counseling agency described in section 111(a) an individual or group briefing (including a briefing conducted by telephone or on the Internet) that outlined the opportunities for available credit counseling and assisted such individual in performing a related budget analysis.

11 U.S.C. § 109(h)(1).

The only exceptions to the credit counseling requirement are found in § 109(h)(3)-(4), which state that:

> (3)(A) Subject to subparagraph (B), the requirements of paragraph (1) shall not apply with respect to a debtor who submits to the court a certification that—
> (i) describes exigent circumstances that merit a waiver of the requirements of paragraph (1);
>
> (ii) states that the debtor requested credit counseling services

from an approved nonprofit budget and credit counseling agency, but was unable to obtain the services referred to in paragraph (1) during the 7-day period beginning on the date on which the debtor made that request; and

(iii) is satisfactory to the court.

(B) With respect to a debtor, an exemption under subparagraph (A) shall cease to apply to that debtor on the date on which the debtor meets the requirements of paragraph (1), but in no case may the exemption apply to that debtor after the date that is 30 days after the debtor files a petition, except that the court , for cause, order an additional 15 days.

(4) The requirements of paragraph (1) shall not apply with respect to a debtor whom the court determines, after notice and hearing, is unable to complete those requirements because of incapacity, disability, or active military duty in a military combat zone. For the purposes of this paragraph, incapacity means that the debtor is impaired by reason of mental illness or mental deficiency so that he is incapable of realizing and making rational decisions with respect to his financial responsibilities; and 'disability' means that the debtor is so physically impaired as to be unable after reasonable effort, to participate in an in person, telephone, or Internet briefing required under paragraph (1).

11 U.S.C. § 109(h)(3)-(4).

The statues are perfectly clear:  an individual debtor must obtain a certificate of credit counseling within the 180 days preceding a voluntary petition in bankruptcy or show that she either attempted to obtain such a certificate and was refused or is disabled, incapacitated, or actively deployed to a combat zone.  There is no statutory authority allowing a debtor to complete a credit counseling course post-petition due to oversight of the debtor or debtor's counsel.

When Carden and Upright filed Mr. Cain's case, Mr. Cain did not have a valid credit counseling certificate; however, he had in fact completed a qualifying credit counseling course.  A certificate of credit counseling was filed in Mr. Cain's case on the same day as his chapter 7 petition,

August 18, 2017; however, the certificate was dated February 8, 2017 – 191 days before Mr. Cain filed his petition. Case No. 17-32361, Doc. 2. While a debtor in bankruptcy is ultimately responsible for the contents of his petition, the facts surrounding this case show that Upright and Carden deserve the majority of the blame for the issues regarding Mr. Cain's credit counseling certificate.

Mr. Cain's Statement of Financial Affairs shows that he paid his attorney fees and filing fees over to Upright in installments, with the first installment on August 11, 2016, and the final installment on January 25, 2017. Case No. 17-32361, Doc. 1. According to his own Statement of Financial Affairs, Mr. Cain began meeting with Upright more than a year before Upright and Carden filed a petition on his behalf. Further, Mr. Cain completed his credit counseling program two weeks after he paid his attorney fees and filing fees in full to Upright.

Mr. Cain was initially assigned by Upright to Mari Morrison, who signed the retainer agreement with Mr. Cain. Exhibit 74. Mr. Cain did not sign a retainer agreement with Carden until February 15, 2018. Exhibit 73. Upright's records show that Morrison communicated with Mr. Cain only once, on August 12, 2016, non-attorney staff contacted Mr. Cain four times, and Carden only spoke with Mr. Cain on July 6, 2017, before emailing a pre-filled copy of the schedules to Mr. Cain on August 11, 2017, then ultimately filing his case on August 18, 2017. On August 11, 2017, when Carden emailed Mr. Cain the pre-filled schedules, Mr. Cain's credit counseling certificate was already stale, and Carden should have known that. A simple examination of the date on the certificate should have alerted Carden to the problem, but it did not.

Unfortunately, Carden did not notice this error, and thus set forth a chain of events that is still unresolved to this day. After realizing the situation, Carden instructed Mr. Cain to complete

-43-

a second credit counseling course, which Mr. Cain did on August 28, at his own expense. Carden filed the August 28 credit counseling certificate on August 31. Case No. 17-32361 Doc. 8.

After the case converted to one under chapter 13 due to unexempt real property, and after the initial chapter 13 341 Meeting of Creditors was continued, the Bankruptcy Administrator filed a Motion for Examination of Debtor's Transactions with Debtor's Attorney, which noted the stale and tardy credit counseling certificates in Mr. Cain's case. Case No. 17-32361 Doc. 33. Soon after, the Chapter 13 Trustee filed a Motion to Convert Case from Chapter 13 to Chapter 7 because Mr. Cain had not filed a Chapter 13 Plan and the equity in the real property he jointly owned with his mother. Case No. 17-32361 Doc. 41.

### 2. Declaration re: Electronic Filing

Perhaps the most glaring professional error committed by Carden in Mr. Cain's case involves Mr. Cain's Declaration re: Electronic Filing. The Declaration re: Electronic Filing was a document used in this District to ensure that the Debtor has reviewed her schedules, that the information contained in the schedules is true and correct, and has authorized her attorney to file her petition, schedules, amendments, plans, motions, and other documents related to their petition electronically. The nature of the Declaration clearing indicates that by signing the petition, the Debtor has reviewed the petition, statements, and schedules, and that those documents are in fact accurate; thus, requiring the Debtor to sign the Declaration after the petition and other documents are ready to file.

Unfortunately, Carden did not understand this requirement. He had Mr. Cain execute the Declaration re Electronic Filing before reviewing the petition, statements, and schedules.

-44-

[OLEN] Q: All right. Do you see that Exhibit 514 is the declaration re: electronic filing in the James Cain case?

[CARDEN] A: I do. Yes.

Q: And first the date for his signature and your signature is typed in, correct? Typewriten?

A: Are you talking about at the top for him, or are you talking about the signature?

Q: I'm talking about the date right above the signature, the date right —

A: Oh. Yeah.

Q: -- Above your signature.

A: I'm sorry. Yes. The date is typed in.

Q: Now, you can see that Mr. Cain didn't put his original signature on this declaration, did he? That's a DocuSign signature, isn't it? Look at it.

A: Yes. He signed it electronically.

Q: Did you not understand that this is being signed under penalty of perjury, and that he had to put an original signature on it?

A: Yes. It is supposed to have an original signature. I agree with that.

[ . . . ]

Q: All right. Well, we saw a minute ago that you drafted the petition and schedules and e-mailed them to the client on August 11, right? You saw that on the time records?

A: Okay.

Q: You can look at them if you'd like to verify. You'll see it.

A: Yes.

-45-

Q: So you had James Cain sign under penalty of perjury that he had reviewed schedules before you ever put them in his possession, right?

A: Well, referring back to my prior testimony –

Q: No. Just answer my question. Answer my question.

A: Yes. In keeping with my prior testimony he signed it prior to seeing the schedules.

Doc. 52 (Transcript of October 29, 2019, Hearing, pp. 78:10-79:5; 79:20-80:8).

The Declaration re: Electronic filing contained a signature block for both the Debtor and Debtor's counsel, in this case, Carden. The purpose of the attorney's signature is to verify that the attorney has reviewed the case, that the attorney will provide the Debtor with a copy of all forms and documents to be filed with the Bankruptcy Court, and in the case of an individual debtor, that the Debtor has read and signed the Form B121 Statement of Social Security Number. Because Carden had Mr. Cain sign the declaration before reviewing his petition, statements, and schedules, it seems Mr. Carden's signature on the document was also in violation of the declaration's instructions.

### 3. Issues Regarding Real Property and Conversion to Chapter 13

In his initial schedules, Mr. Cain did not list that he had any interest in real property. On the day of Mr. Cain's 341 Meeting of Creditors, he informed Carden, and then the Chapter 7 Trustee, that his mother had deeded him a one-half interest in her house. Carden filed amendments to Schedule A/B and C to list Mr. Cain's one-half interest in his mother's house and claimed an exemption for some of the equity. Case No. 17-32361, Docs. 10 & 11, respectively. However, the Chapter 7 Trustee objected to Mr. Cain's claim of exemption on his mother's house because he did

-46-

not qualify for an exemption; the Court sustained Trustee's objection after the time for -responses elapsed with no response.  Case No. 17-32361, Docs. 15 & 20, respectively.

To prevent the Chapter 7 Trustee from selling Mr. Cain's mother's house, Carden moved to convert Mr. Cain's case from Chapter 7 to Chapter 13, which was ultimately granted.  Case No. 17-32361, Doc. 21.  At this point, Carden had Mr. Cain complete a third credit counseling course.  After the conversion, Mr. Cain had until February 4, 2018, to file his Form 122C-1 and his Chapter 13 Plan.  On February 7, because the forms and plan had not been timely filed, the Chapter 13 Trustee moved to convert the case back to Chapter 7.  Case No. 17-32361, Doc. 41.  That day, Carden filed Mr. Cain's Form 122C-1 and Chapter 13 Plan.  Case No. 17-32361, Docs. 40 & 43, respectively.

After Carden defeated an Objection to Confirmation filed by the Trustee and amended Cain's Chapter 13 Plan, the Court confirmed Cain's Chapter 13 Plan on March 31, 2018.  Case No. 17-32361, Doc. 78.

### 4.  Carden's Improper Handling of the end of Mr. Cain's Case

After the confirmation of Mr. Cain's Chapter 13 Plan, Mr. Cain had cleared the most difficult hurdle for most debtors.  The Trustee's Objection to Confirmation, while ultimately overruled, did not seek to dismiss Mr. Cain's case due to his failure to obtain pre-petition credit counseling.  However, the Bankruptcy Administrator had filed a Motion to Examine Debtor's Transactions with Debtor's Attorney, which did raise the issue, but also did not seek to dismiss Mr. Cain's case.  Case No. 17-32361, Doc. 33.

Nevertheless, Carden filed a Motion to Validate for Mr. Cain's post-petition credit counseling certificate.  Case No. 17-32361, Doc. 90.  At the time Carden filed this Motion, Mr. Cain

-47-

had achieved confirmation of his plan and had completed the required financial management course; he only needed to complete his 36-month plan in order to qualify for a Chapter 13 discharge. Carden's filing of the Motion needlessly imperiled Mr. Cain's bankruptcy protection, and, ultimately resulted in the dismissal of Mr. Cain's case. Case No. 17-32361, Doc. 91.

More shocking still, Carden did not file a new case for Mr. Cain after the dismissal of Mr. Cain's Chapter 13 case. When questioned about this, Carden displayed his complete misunderstanding of the law with regard to the automatic stay and filing a new case after the dismissal of a prior case:

> [OLEN] Q: All right. Look at 536. "Order. Debtor filed an amended motion to allow for order validating credit counseling--" it says cort (sic), I think it means certificate, "nunc pro tunc." Do you see that?
>
> [CARDEN] A: I do.
>
> Q: "Order is clear. Ordered that the motion is denied and this case is dismissed." Do you see that?
>
> A: I do.
>
> Q: And this -- once that order was entered the case was dismissed, you all could have gone and filed another bankruptcy case for Mr. Cain, right?
>
> A: In that window of time before -- I don't recall exactly when the case was reopened by the bankruptcy administrator, or held open, or however you want to say that, there might have been a narrow window of time, or some window of time where that would have been possible.
>
> Q: Wait a minute now. Just because the case was being held open doesn't mean you couldn't file another case for Mr. Cain, does it, because –
>
> A: I don't know that.

Q: I'm sorry?

A: I don't know that.

Q: But you didn't try, did you?
A: Tried –

Q: You didn't try?

A: Tried by the method of trying to file a motion to get an order from the Court seeking instructions on being able to do so.

Q: Mr. Carden, did you file another bankruptcy case for James Cain?

A: I've already testified no, I did not.

Q: Did you try to file another bankruptcy case for James Cain by actually submitting the petition to the clerk to see whether they would accept it?

A: Not by submitting the petition to the clerk.

Doc. 52 (Transcript of October 29, 2019, Hearing, pp.93:1-94:10).

Carden failed to provide competent legal services to Mr. Cain by failing to recognize the fundamental difference between the dismissal of a bankruptcy case and the closure of the case. After the dismissal of Mr. Cain's Chapter 13 case, Carden had two options to ensure that Mr. Cain regained bankruptcy protection: File an entirely new case or file a Motion to Reconsider Order of Dismissal. Carden did neither. Carden's failure to understand Mr. Cain's current predicament is best summarized in Carden's own words:

[OLEN] Q: What did you tell James Cain about why he didn't get a discharge?

[CARDEN] A: We had a conversation of the fact that -- of what happened with the credit counseling certificate, and of the steps being taken to try and solve that. And that the case -- I explained to him about the motions we were filing with the case being held open by the

-49-

Bankruptcy Administrator's Office, and that we were attempting to get a ruling from the Court so the case could be closed so we could re-file it. And so I've had those conversations as to the -- the overall status and what led to that.

Doc. 52 (Transcript of October 29, 2019, Hearing, p. 105:10-20).

### C. Grady Carden and Upright's Failure to Provide Competent Representation to Clayton and Shirley Cobb in Case No. 17-32876

The Court next directs its attention to the case of Clayton and Shirley Cobb, case no. 17-32876, in which the debtors were represented by Grady E. Carden. The failures of Carden in the Cobb case echo his failures in Mr. Cain's case, but unlike the Mr. Cain's case, Carden's lack of competent representation has not cost the Cobbs their discharge.[10]

### 1. Deficiency of the Pre-Petition Credit Counseling Certificate

Much like Mr. Cain's case, the credit counseling certificates for the Cobbs were more than 180 days old on their petition date. Both Mr. and Mrs. Cobb completed their credit counseling course on March 16, 2017; they filed their petition 203 days later on October 5, 2017. Again, Carden had a duty to review the petition and its components prior to filing. A simple examination of the certificates would have alerted a competent attorney that the Cobbs' certificates were stale.

In the exact same vein as Mr. Cain's case, the Cobbs completed their credit counseling program very soon after they finished paying their attorney fees and filing fees to Upright, yet a significant delay in the filing of their case resulted:

---

[10] An Order granting Debtors' Voluntary Motion to Dismiss was inadvertently entered on March 1, 2019 at docket entry 65. An Order Reinstating Case was entered on March 4, 2019, at docket entry 67.

[OLEN] Q:  [ . . . ] All right.  Exhibit 568 is a voluntary petition that Upright filed for the Cobbs.  I want to direct your attention to Page 37.

[CARDEN] A:  I'm there.
Q:  The date of last payment is February 22, 2017.  Correct?

A:  Correct.

Q:  Upright filed this bankruptcy petition for the Cobbs on October 5, 2017, correct?

A:  Correct.

Q:  Seven-and-a-half month delay, correct?

A:  Correct.

[ . . . ]

Q:  Okay.  And then the Cobbs, we're about to see, they had -- all right.  I'm going to show you Exhibit 569, 570, 574 and 575.  You see this is the two sets of credit counseling -- certificates of credit counseling for each of the Cobbs?

A:  I do.

Q:  And the first one was invalid because you all waited too long to file the bankruptcy case, right?

A:  It was filed out of date in error.  That would be correct/

Q:  Would you end up -- in error?

A:  It was filed out of date.

Q:  You said in error?

A:  In an error on my part/

Q:  Well, that was more than an error, wasn't it?  That was an egregious act of malpractice, wasn't it?

-51-

A:  I would not characterize it that way.  No.

Q:  It was certainly below the standard of care for a reasonably prudent Upright lawyer, isn't it?

A:  I wouldn't characterize it that way.

Q:  Oh.  You're -- you don't think filing a bankruptcy case with a stale certificate of credit counseling is below the standard of care?

A:  I would not characterize it that way.  No.

Doc. 52 (Transcript of October 29, 2019, Hearing, pp. 98:22-99:7; 100:9-101:5).

Again, Carden's failure to review the credit counseling certificates prior to filing the Cobbs' petition is yet another example of Carden's failure to provide competent legal services to his clients.

## 2.  Carden's Improper Handling of the end of Mr. & Mrs. Cobbs' Case

As seen in Mr. Cain's case, Carden provided Mr. & Mrs. Cain with the misguided advice that the only way to proceed was to dismiss their Chapter 7 case and file a new case.  Just as the Cain case, however, neither the Chapter 7 Trustee nor the Bankruptcy Administrator had moved to dismiss the Cobbs' case due to the credit counseling certificate deficiency.  Nonetheless, Carden, on behalf of the Cobbs, filed a Voluntary Motion to Dismiss their Chapter 7 case on February 27, 2019.  Case No 17-32876, Doc. 64.  While the Court inadvertently entered an Order Granting the Cobbs' Motion on March 1, 2019, it entered an Order Reinstating Case on March 4, 2019, thereby preventing the Cobbs from needlessly scuttling their financial lifeboat on account of Carden's misguided legal advice.

-52-

**D.  Grady Carden and Upright's Failure to Provide Competent Representation to Chandra Clark in Case No. 17-32873**

The Court now directs its attention to the case of Chandra Clark, case no. 17-32873, in which the debtor was represented by Grady E. Carden.  The failures of Carden in the Clark case echo his failures in Mr. Cain's case, and the Cobb case, but unlike the those cases, Carden's lack of competent representation extended beyond Clark's Chapter 7 discharge.

**1.  Deficiency of the Pre-Petition Credit Counseling Certificate**

Much like Mr. Cain's case and the Cobb case, the credit counseling certificate for Clark was than 180 days old on her petition date.  Clark completed her credit counseling course on March 7, 2017; she filed her petition 213 days later on October 5, 2017.  Yet again, Carden had a duty to review the petition and its components prior to filing and failed to exercise his duty.  A simple examination of the certificates would have alerted a competent attorney that Clark's certificate was stale.

In the exact same fashion as Mr. Cain's case and the Cobb case, Clark completed her credit counseling program very soon after she finished paying her attorney fees and filing fees to Upright, yet again, a significant delay in the filing of their case resulted:

> [OLEN] Q:  All right.  Exhibit 555.  All right. This is the voluntary petition that Upright filed for Chandra Clark.  Turn to page 36, please.
>
> [CARDEN] A:  I'm there.
>
> Q:  The date of last payment was made by Ms. Clark on March 1, 2017.  Correct?
>
> A:  Correct.

Q: Upright didn't file this case until October 5, 2017, correct?

A: Correct.

Q: Over seven months later?

A: Correct.

Q: Now, Ms. Clark had to file -- had to obtain multiple certificates of credit counseling also, correct

A: She did.

Doc. 52 (Transcript of October 29, 2019, Hearing, pp. 104:15-105:4).

As was the case in the Cain case and the Cobb case, Carden's failure to review the credit counseling certificate prior to filing the Clark's petition is yet another example of Carden's failure to provide competent legal services to his clients.

## 2. Carden's Improper Handling of the end of Ms. Clark's Case

As seen in Mr. Cain's case and the Cobbs' case, Carden provided Clark with the misguided advice that the only way to proceed was to dismiss her Chapter 7 case and file a new case. Just as the Cain case, however, neither the Chapter 7 Trustee nor the Bankruptcy Administrator had moved to dismiss Clark's case due to the credit counseling certificate deficiency. However, unlike Mr. Cain's case or the Cobbs' case, by the time Carden gave Clark this incorrect legal advice, Clark had already received her Chapter 7 discharge in January of 2018. Case No. 17-32873, Doc. 14.

Despite the entry of discharge, over a year later, Carden, on behalf of Clark, filed a Voluntary Motion to Dismiss her Chapter 7 case on February 27, 2019. Case No 17-32873, Doc.4 43. While the Court inadvertently entered an Order Granting Clark's Motion on March 1, 2019, it

-54-

entered an Order Reinstating Case on March 4, 2019, thereby preventing Ms. Clark from needlessly

scuttling destroying or otherwise jeopardizing her discharge.

At trial, the Court questioned Carden about this bizarre series of events:

> THE COURT Q: Okay. So the case rocked along. I see some amendments were filed. A discharge was entered by the Court on January 27, 2018. So in this case the client got their Chapter 7 discharge, January 17 of '18. I see the B.A. filed a motion for examination. One of the several motions that sort of kicked off in these proceedings. And about a year later, February of 2019, there was a debtor's motion to dismiss. Why would you file a debtor's motion to dismiss in a Chapter 7 case where you've got a discharge?

> THE WITNESS [CARDEN] A: This goes back, Your Honor, where these cases were still being open for examination and they were still being scrutinized for the -- the certificate of credit counseling being out of date, continuing to be told that the method that was attempted of cure by getting a subsequent certificate and filing that did not cure it after all, and that the problem still existed.

> Q: Right. Right. No, no.

> A: So that was just my attempt to --

> Q: I get that.

> A: -- resolve it.

> Q: The code says to be a debtor, you know, under 109(h), or something like that, to be a debtor you've got to have a -- this -- counseling done within six months before the date of the petition. If you don't do it, then theoretically you can't be a debtor under 109 of the Code.
>
> And I don't know if maybe the B.A. didn't see it, or the trustee didn't notice it until after the discharge was entered, but if the debtor got his discharge why would you move to dismiss the case? I mean, I'm just -- I'm just unsure as to why you would have done that.

> A: My goal all along from the very beginning when this issue came up was for the Court to deem the subsequently filed credit counseling

-55-

certificates to be accepted and that the case would then be discharged and/or plan approved and they could continue on with the case.

Q: Right. But the case was discharged.

A: I -- I recognize that, Your Honor. And so when the case got reopened and it continued to be an issue, I guess that my thinking at that point became even thought [sic] they got the discharge, it appears as though this is not a settled deal, that we're still saying that the -- the discharge is not valid in some way, I guess is the way I was looking at it. And so otherwise why continuing to scrutinize that particular case and saying that you haven't satisfied the code as it relates to the certificate. And so --

Q: But in another case you had moved to say, okay, we've got a stale certificate, why don't you just accept it anyway? I guess -- I'm just troubled that you -- you know, you kind of got away with it here, whether -- whether you just kind of snuck it by the trustee and the B.A. or maybe they saw it and said, ah, we're going to file a motion and we're going to give Grady Carden a bad time, but we're not going to penalize -- I'm not sure what the -- what the thought process would have been on their part.

Doc. 52 (Transcript of October 29, 2019, Hearing, pp. 157:24-160:2).

This exchange solidifies the fact that Carden did not appreciate the difference between the Bankruptcy Administrator's efforts to examine his transactions with Clark and his other clients and an effort by the Trustee or the Bankruptcy Administrator to attack debtors' discharges or status as debtors. The Motion to Examine was clearly aimed at Carden and Upright, not Clark or any of the other debtors. The Court finds this as an extreme example of Carden's failure to provide competent legal advice to his clients.

-56-

### E. Summary of The Failures of Upright Attorneys to Provide Competent Legal Counsel

The Court heard seven days of oral testimony, admitted thousands of pages of documents into evidence, and made written findings on a representative fraction of the number of cases considered.  The practice of law by the Upright lawyers is far below what the Court believes is an acceptable level.  The Court found the attitudes of the Upright lawyers and personnel flippant and cavalier.  The most charitable take on the Alabama lawyers is that they were often disengaged.  The Court believes, based on past experience, that they are capable of practicing at a far greater level than they demonstrated in the issue-riddled cases brought before the Court over the seven days of trial.

The Court believes that Upright's business model fostered an environment of confusion, incompetence, and apathy that gave rise to the results the Court observed in the 87 cases examined.  That said, no matter the business model, an Alabama lawyer is always obligated to provide competent representation to her clients.  If the business model under which he is employed does not allow him the means to provide competent representation, then he is obligated cut ties and seek another position elsewhere.  In one of the few rays of hope gleaned through the seven-day slog of a trial, the Court saw evidence that a number of Upright cases were filed by Middle District lawyers who, shortly thereafter, severed their association with Upright altogether.

Perhaps the biggest issue with Upright's business model is that non-lawyer staff in Chicago, hundreds of miles away and with no effective supervision, are practicing law in bankruptcy cases filed in the Middle District of Alabama.  Many consumers who file bankruptcy are looking to save their homes from foreclosure and are naturally quite stressed and concerned.  Unfortunately, some

turned to Upright.

> [OLEN] Q:  Somebody at Upright talking about their debtor client who is in danger of losing her home that – that's what the Trustee said, then characterizes that as blah, blah, blah.  Right?
>
> [GALLOWAY] A:  Yes, they did.

Doc. 49 (Transcript of October 23, 201, Hearing, p. 194:8-20).

## V.  Sanctions

In Part III above, the Court determined that the Alabama lawyers are not true partners and are not regular associates in Upright Law.  Rather, Upright Law is engaged in the unlawful practice of law in the 87 bankruptcy cases identified by the Bankruptcy Administrator.  In Part IV above, the Court finds the Respondents, that is Upright Law and the three named Alabama lawyers, are not practicing law at a level acceptable to the Court.  Having determined this, the Court must next determine the consequences.  The debtors in the 87 identified bankruptcy cases have not been represented by properly licensed lawyers.  The three Alabama lawyers named as Respondents here have performed some services, but the licensing deficiency may not be papered over by hiring Alabama lawyers on a contract basis.  Moreover, those legal services that have been provided have largely been provided in a substandard manner.

Taking these two deficiencies in tandem, the Court determines that all attorney fees paid in these cases, should be disgorged and returned to the debtors pursuant to § 504(b)(1) as improper fee sharing and pursuant to § 329(b) and Rule 2016(b) and Rule 2017 as improper fee disclosures. Upright has made representations to the effect that this has been done.  The Court is not aware that

the Bankruptcy Administrator agrees. Within 14 days of the date of this Memorandum Decision, the Bankruptcy Administrator shall make a filing with the Court that either (1) she agrees that this has been done or (2) that she disagrees and that further proceedings shall be held.

At the close of the evidentiary hearing, counsel for the Complainants requested that a substantial monetary sanction be imposed. Upright is a "debt relief agency" as defined under § 101(12A), and, as such, must comply with §§ 526 and 707(b)(4)(B), and Rule 9011.

11 U.S.C. § 526 provides, in relevant part, as follows:

(a) A debt relief agency shall not--
    (1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;
    (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;
    (3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to--
        (A) the services that such agency will provide to such person; or
        (B) the benefits and risks that may result if such person becomes a debtor in a case under this title; or
    (4) advise an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer a fee or charge for services performed as part of preparing for or representing a debtor in a case under this title.

\* \* \*

(c) (2) Any debt relief agency shall be liable to an assisted person in the amount of any fees or charges in connection with providing bankruptcy assistance to such person that such debt relief agency has received, for actual damages, and for reasonable attorneys' fees and costs if such agency is found, after notice and a hearing, to have--
    (A) intentionally or negligently failed to comply with any provision of this section, section 527, or section 528 with respect to a case or proceeding

-59-

under this title for such assisted person;

(B) provided bankruptcy assistance to an assisted person in a case or proceeding under this title that is dismissed or converted to a case under another chapter of this title because of such agency's intentional or negligent failure to file any required document including those specified in section 521; or

(C) intentionally or negligently disregarded the material requirements of this title or the Federal Rules of Bankruptcy Procedure applicable to such agency.

11 U.S.C. §§ 526(a) & (c)(2). Section 526(c)(5) grants the Court the right to enjoin violations or impose civil penalties for violations of § 526. 11 U.S.C. § 526(c)(5). Furthermore, a court may, pursuant to § 707(b)(4)(B), assess "an appropriate civil penalty against the attorney for the debtor" for violations of Rule 9011. 11 U.S.C. § 707(b)(4)(B); FED. R. BANKR. P. Rule 9011; *In re White*, No. 16-72114-JHH, 2018 WL 1902491, at *8 (Bankr. N.D. Ala. Apr. 19, 2018), *aff'd sub nom. L. Sols. of Chicago LLC v. Corbett*, No. 1:18-CV-00677-AKK, 2019 WL 1125568 (N.D. Ala. Mar. 12, 2019), *aff'd*, 971 F.3d 1299 (11th Cir. 2020).

First, Upright was engaged in the unlawful practice of law in this district. Second, the quality of its practice of law ranges from substandard to abysmal. Third, it did not appear to have any intention of stopping it what it was doing until counsel was hired and serious litigation ensued. At trial, the Court heard hours of testimony regarding Upright's business model, substandard practices, and its use of Alabama lawyers to facilitate the Chicago office's ability to practice law in this district. The Court finds the Respondents failed to comply with the requirements of § 526 and made numerous representations to the Court in violation of Rule 9011. Accordingly, the Court finds a civil penalty of $500,000 is appropriate in this case.

Pursuant to this Court's inherent power and its power under § 105, the Court is of the view that counsel for the Complainants should be awarded attorney's fees. As noted above, Upright's

business model and mishandling of cases in Alabama was on a broad spectrum, as evidenced by the 87 cases identified by the Bankruptcy Administrator. Upright has engaged in scorched earth litigation here in defense of its policies and practices. Had counsel not been hired and had counsel not energetically prosecuted these proceedings on behalf of the Bankruptcy Administrator, the Chapter 13 Trustee, and the Chapter 7 Trustee, there is no reason to believe that Upright would have ceased its mishandling of cases. Counsel for the Complainants shall file his application for attorney's fees within 14 days of the date of this Memorandum Decision. Upright shall file its response within 14 days of service of the application.

The Court is of the view that Upright Law, now Deighan Law, is enjoined from further practice of law in this Court, under any form, until the below described condition is met. In the event Upright Law seeks to practice law here in the future, whether using local Alabama lawyers as "partners" or through any other means, it should first contact the Bankruptcy Administrator and make her aware of its plans. If the Bankruptcy Administrator agrees, they shall submit a joint motion with the Court to vacate the injunction, setting out the terms of their agreement. If Upright Law seeks to practice in this Court and cannot reach an agreement with the Bankruptcy Administator, it shall file a motion with this Court, upon notice to Complainants in this Miscellaneous Proceeding. The injunction shall remain in effect until the Court acts on the motion.

As set out in Part IV, the three Alabama lawyers, Mari Morrison, Grady Carden, and Cody Foote, have been aiding Upright Law in its unauthorized practice of law, lending their licenses and attempting to paper over deficiencies. None of the three had any authority to direct Upright personnel in Chicago. Moreover, the level of their practice has not been acceptable. On the other hand, the Court is aware that there is no controlling authority for the proposition that the Upright

business model is illegal. At least one Court has determined that Upright is a valid law firm, contrary to the position taken by the Petitioners here and contrary to this Court's holding. *Deighan Law, LLC v. Daugherty*, 615 B.R. 564 (E.D. Mo. 2020). While the Court has concerns of potential violations of the Alabama Rules of Professional Conduct, the Court recognizes the Alabama lawyers relied upon an opinion letter written by a prominent Chicago lawyer who provided an opinion to the effect that the Upright Law business model was legal and complied with all pertinent rules of ethics. Upright Exhibit 25, Mary Robinson Letter of Dec. 9, 2015. Even though this Court has come to a conclusion which differs from that reached in the Robinson letter and *Daugherty*, the Court concedes that the reliance of the Alabama lawyers on the opinion letter was reasonable.[11] The Court notes an interesting paragraph on Page 2 of the Robinson letter:

> All three of us have seen lawyers attempt business models designed to provide legal services in high volume areas of practice, where the focus on profits and the prominence of nonlawyer participation has resulted in poor to dismal service to clients, and our review of Upright's model was guided by the lessons learned through that experience.

Upright Exhibit 25. If Ms. Robinson had observed what this Court has observed, she might change her opinion. This Court is dismayed by what it has observed. "Poor to dismal service to clients" is an accurate description of what was observed here.

Upright takes 75-80% of the fee and does an indeterminate amount of work, not under the supervision of the Alabama lawyer who receive only 20-25% of the fee, yet all of the responsibility. It appears that the Alabama lawyers taking the cases, in some cases, attempted to cut corners, with sometimes disastrous results. The undersigned has not seen any of the three Alabama lawyers, nor

---

[11] The Court notes that its decision is based upon a one-week trial where witnesses were heard in open court subject to cross examination. The decision in *Daugherty* was based upon stipulated facts and the opinion letter was based upon assumed facts, which did not bear out the reality observed by this Court in the context of 87 actual bankruptcy cases with real debtors.

-62-

anyone else purporting to represent Upright in this Court since the trial. The three Alabama lawyers testified at the trial and appear to been embarrassed and chagrined at their experience and do not appear to be inclined to return in any representative capacity for Upright. Nevertheless, the Court finds Mari Morrison, Grady Carden, and Cody Foote shall each complete 15 hours of continuing legal education in consumer bankruptcy law and shall file in this Miscellaneous Proceeding a notice upon completion of the CLE requirement.

## VI. Conclusion

Upright contends that it is a legitimate law firm, that its Alabama lawyers are true partners in the firm and that the Bankruptcy Administrator and Trustees, Wilkins and McKinney are making much ado about nothing when it comes to operational errors, some of which are found in any consumer bankruptcy practice.

Blah, blah, blah . . . .

The Court imposes sanctions as set out in Part V above. The Court will enter an order as a separate order.

Done this 4th day of March, 2022.

William R. Sawyer
United States Bankruptcy Judge

c:      Charles A. Armgardt
        Deighan Law LLC f/k/a Law Solutions Chicago, LLC d/b/a Upright Law, LLC and
        Upright Law
        Upright Law LLC
        Mari Morrison
        Grady Carden
        Cody Foote
        Danielle K. Greco, Bankruptcy Administrator
        Sabrina L. McKinney, Chapter 13 Trustee
        Carly B. Wilkins, Chapter 7 Trustee
        Steve Olen, Attorney for Trustee

Case 19-00301    Doc 67    Filed 03/04/22    Entered 03/04/22 14:48:49    Desc Main
                          Document       Page 64 of 66

# APPENDIX

| No. | Case No. | Debtor(s) |
| --- | --- | --- |
| 1 | 14-32946 | Clark & Victoria Sechler |
| 2 | 14-80964 | Shaun & Christina Lewis |
| 3 | 15-10878 | Jonathan & Cynthia Grice |
| 4 | 15-80272 | Franklin & Jeanne Reed |
| 5 | 15-30919 | Rufus & Sharon Cotton |
| 6 | 16-30118 | Maria Miller |
| 7 | 16-31433 | Jerry Moomey |
| 8 | 16-31535 | Ricky & Deborah Stinson |
| 9 | 16-32020 | Mark & Teresa Deuschle |
| 10 | 16-33607 | Robert & Phyllis Wilson |
| 11 | 16-80048 | Bernadino Arroyo |
| 12 | 16-80049 | Mark Adams |
| 13 | 16-80089 | Mary Allen |
| 14 | 16-80141 | Ellen Yates |
| 15 | 16-80947 | Rodney & Quacheryl Pugh |
| 16 | 16-81040 | Michael Miller |
| 17 | 16-81072 | Zachary & Kaitland Causland |
| 18 | 16-81102 | Benjamin Kinsman |
| 19 | 16-81169 | Bacle Fowler, II |
| 20 | 16-81370 | Louise Mullgrav-Vines |
| 21 | 16-81413 | Caroline Stevens |
| 22 | 16-81544 | Bryan Jordan & Lacy Thrower |
| 23 | 16-81572 | Ian Willett |
| 24 | 16-81585 | Robbie Kellum |
| 25 | 17-11726 | Mary McKinnes |
| 26 | 17-12128 | Paul Pollan |
| 27 | 17-12372 | Letitia Pate |
| 28 | 17-12375 | Xavier Thomas |
| 29 | 17-30048 | Joseph Andreas |
| 30 | 17-30132 | Tony Mason |
| 31 | 17-32361 | James Cain |
| 32 | 17-32767 | Rickey Jackson |
| 33 | 17-32842 | Linda Bell |
| 34 | 17-32873 | Chandra Clark |
| 35 | 17-32876 | Clayton Cobb, Jr. & Shirley Cobb |
| 36 | 17-33347 | Joseph White |
| 37 | 17-33353 | Stacey Ross |
| 38 | 17-33520 | James Lewis |
| 39 | 17-33530 | Valerie Bowden |
| 40 | 17-80037 | Jack Taylor |
| 41 | 17-80221 | Brytne Smith |
| 42 | 17-80243 | Christopher Culverhouse |
| 43 | 17-80327 | Laura Graham |

| | | |
|---|---|---|
| 44 | 17-80387 | James Patterson |
| 45 | 17-80425 | Norman Darden |
| 46 | 18-80440 | Jasmine Woods |
| 47 | 17-80469 | Jared & Amy Goertzen |
| 48 | 17-80525 | Delois Pogue |
| 49 | 17-80533 | Debbie King |
| 50 | 17-80547 | Sydelle Story |
| 51 | 17-80563 | Donna Hill |
| 52 | 17-80566 | Terrell & Kathleen Atkins |
| 53 | 17-80604 | James & Bridgett Allred |
| 54 | 17-80639 | Harvey Morse, III & Heather Morse |
| 55 | 17-80736 | Michael & Neva Roundtree |
| 56 | 17-80758 | Iva Anglin |
| 57 | 17-80776 | Sandra Warren |
| 58 | 17-80801 | Monica McFry |
| 59 | 17-80812 | Michael Gregory |
| 60 | 17-81018 | Tanya Mays |
| 61 | 17-81087 | Mae Hicks |
| 62 | 17-81163 | Derrick Echols |
| 63 | 17-81207 | Lauren Wampler |
| 64 | 17-81278 | Patty Williams |
| 65 | 17-81465 | Kimberly Smith |
| 66 | 17-81496 | Matthew & Mandy Black |
| 67 | 17-81508 | Joella Newsome |
| 68 | 17-81667 | David Nelams |
| 69 | 18-10239 | Christopher Merritt |
| 70 | 18-10263 | Marsha Smith |
| 71 | 18-10266 | Barbara Owens |
| 72 | 18-31024 | Jeremy Wallace |
| 73 | 18-31251 | Randall Cleckler |
| 74 | 18-80088 | Candice Ousley |
| 75 | 18-80160 | Roy Whistle |
| 76 | 18-80227 | David Lilly |
| 77 | 18-80285 | Ashley Battle |
| 78 | 18-80392 | Andrew Newton |
| 79 | 18-80509 | Jessica Boyd |
| 80 | 18-80534 | Valorie Motley |
| 81 | 18-80648 | Paul Smith, Jr. & Annie Smith |
| 82 | 18-80708 | Mickey Stoneback |
| 83 | 18-80803 | Sylvia Willhite |
| 84 | 18-80919 | Shandricka Calloway |
| 85 | 18-81003 | Tasneem Mohamed |
| 86 | 18-81343 | Shelby Chatman, Jr. & Amanda Chatman |
| 87 | 18-32711 | William Liver & Lisa Miller |